UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHIGNTON

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

BRADLEY C. MILTENBERGER,

                Defendant.

No.  1:14-PO-08177-JPH

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

       This petty offense matter came on regularly for bench trial on February 20, 2015 before the undersigned United States Magistrate Judge.  Legal Intern, Tyler Rube, supervised by Assistant United States Attorney Tyler Tornabene appeared on behalf of the United States of America ("Government").  Defendant, Bradley C. Miltenberger, appeared *pro se*.

       Defendant, a resident of Oregon, is charged by Violation Notice with entering a closed portion of a national wildlife refuge in violation of 50 C.F.R. 25.21, in the Umatilla National Wildlife Refuge ("UNWR").  At the trial, the Government offered the testimony of U.S. Fish and Wildlife Services Officer Christopher David and Regional Land Surveyor David Hills. Defendant offered his

ORDER - 1

own testimony and the testimony of his wife, Chavonne Miltenberger.    In addition, a number of exhibits were admitted into evidence.  (ECF No. 20, Ex. 2).  Based on the evidence submitted at the trial, the arguments of counsel and the Defendant, the Court makes the following Findings of Fact and Conclusions of Law.

**I. FINDINGS OF FACT**

1.  The alleged violation occurred on the afternoon of August 16, 2014, a Saturday.  The Defendant and his family had stopped their boat on the shore of the Columbia River at Little Blalock Island, set up a shade canopy and chair on a sand bar at the shallow water's edge, and allowed the children to swim.   The Defendant was located on a mud flat or sand bar, in the shore zone below the present day high-water mark and above the water's edge.

2. The Columbia River consists of waters of exceptional cultural, economic, commercial, navigational, recreational, and ecological significance to the area.  The Columbia River is the largest river in the Pacific Northwest region and forms the interstate boundary between Washington and Oregon.   Its navigability is stipulated. The river contains 14 hydroelectric dams, including the John Day Dam which is located 216 miles upriver from where the river empties into the Pacific Ocean.

ORDER - 2

3. The construction of the John Day Lock and Dam Project commenced in the late 1950s and completed in 1971.   The reservoir within the Columbia River created by the construction of the John Day Dam is Lake Umatilla.  David Hills testified that Blalock Island is a large island in the Columbia River.  After the flooding behind the John Day Dam, only areas of higher ground remained creating a cluster of smaller islands (*see* Ex. 1), including what is today referred to as "Little Blalock Island." Water levels at Little Blalock Island are regulated by operation of the dam by the United States Army Corps of Engineers.

4. As part of the John Day Dam project, the United States acquired title by condemnation to large tracts of riparian land lying within and along the Columbia River.  Government's Exhibit 9 is a "title  opinion" letter dated January 4, 1966 from the U.S. Attorney General to the U.S. Secretary of the Army regarding his examination of the title evidence for Blalock Island, 3,596 acres referred to as "Tract 1203."  The letter states the United States obtained valid title to Tract 1203 in condemnation proceedings after final judgment (entered June 11, 1965) and payment of the award of $87,250 plus interest.  The letter states the estate acquired was "[t]he fee simple title, subject, however to existing easements for public roads, and highways, for public utilities, railroads and pipelines." (Ex. 9).

5. Government's Exhibit 10 is a Certificate of Title for Blalock Island ("Tract 1203") dated July 30, 1963 and prepared by Puget Sound Title Insurance

ORDER - 3

Company.    The boundary between land and the parcels bordering water was described as "the line of ordinary high water of the Columbia River."  (Ex. 10 at 4).  The Certificate of Title states that title to the property was "indefeasibly vested in fee simple of record in: United States of America as of the 30th day of July 1963…"

6.    Although the natural riverbed beneath Lake Umatilla has not been surveyed, David Hills testified that he relied upon historical imagery and GIS software to determine that the pre-dam ordinary high-water level of the Columbia River at Blalock Island was approximately elevation 240 above sea level.  With the construction of the dam and creation of Lake Umatilla the water level rose by approximately 20 feet.

7.  In 1969, the Umatilla National Wildlife Refuge was established to mitigate habitat loss due to flooding caused by the construction of the John Day Dam.  (Ex. 126). The UNWR encompasses over 20,000 acres and a 20-mile stretch of the Columbia River which includes "open water, shallow marshes, backwater sloughs, croplands, islands, and shrub-steppe uplands."  (Ex. 125; Ex. 1).

8.  Public recreation, including boating, hunting, and fishing, is allowed within the UNWR.   For decades, Little Blalock Island was "classified for recreational use" and excepted from UNWR management.  (Ex. 17).  This changed in July 1995 when the Army Corps of Engineers transferred management authority

ORDER - 4

over Little Blalock Island to the U.S. Fish and Wildlife Service (FWS).  The FWS

designated Little Blalock Island an area closed to the public.

9. In the afternoon of August 16, 2014, FWS Officer Christopher David

received notice from two Oregon State Fish and Wildlife officers that people were

on Little Blalock Island.  Officer David and three other officers boated to the

Island.  As Officer David approached the group, he observed a boat anchored at the

shoreline and a shade canopy "a short distance" from the boat on the shore.

Defendant was located in area at times covered by water, above the *pre-dam* high-

water mark, but below the present day high-water mark.

The Defendant explained to Officer David his belief that he high a right to

recreate in the navigational river channel below the high-water mark.  Officer

David issued the Defendant Violation Number 4397031 for entering a closed

portion of the UNWR.

10. The FWS maintains "Island Closed" signs on stakes and posts on Little

Blalock Island.  (Exs. 2, 4).  The FWS maintains different signs elsewhere in the

UNWR to designate boundaries. The Government entered into evidence several

photographs showing the Island Closed signs.  The evidence shows the closest sign

to the Defendant on the day in question was a single small white sign on a post

approximately 25 feet upland from the location of the incident.  *See also*, ECF No.

1 (Statement of Probable Cause). Defendant admits noticing the distant sign. There

ORDER - 5

is no evidence that the Defendant ever approached or accessed any land beyond a UNWR sign.

## II.    CONCLUSIONS OF LAW

### A. The Charge

Defendant is charged with failing to comply with a refuge regulation, 50 C.F.R. § 25.21, which provides in pertinent part as follows:

> *Except as provided below*, all areas included in the National Wildlife Refuge System are closed to public access until and unless we open the area for a use or uses in accordance with the National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. 668dd–668ee), the Refuge Recreation Act of 1962 (16 U.S.C. 460k–460k–4) and this subchapter C…We may open an area by regulation, individual permit, or public notice, in accordance with § 25.31 of this subchapter.

50 C.F.R. § 25.21.  A violation of this regulation is a petty offense.  The provision § 25.21 references, subchapter § 25.31, provides:

> Whenever a particular public access, use or recreational activity of any type whatsoever, not otherwise expressly permitted under this subchapter, is permitted on a national wildlife refuge *or where public access, use, or recreational or other activities previously permitted are curtailed*, the public may be notified by any of the following methods, all of which supplement this Subchapter C:
>
> (a) *Official signs posted conspicuously at appropriate intervals and locations*;
>
> (b) Special regulations issued under the provisions of § 26.33 of this Subchapter C;
>
> (c) Maps available in the office or the refuge manager, regional director, or area director,

ORDER - 6

(d) *Other appropriate methods which will give the public actual or constructive notice of the permitted or curtailed public access, use, or recreational activity.*

50 C.F.R. § 25.31 (emphasis added).

The mission of the National Wildlife Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States…" 16 U.S.C. § 668dd(a)(2).    Public recreation was recognized by Congress as a legitimate use in the National Wildlife Refuge System. 16 U.S.C. § 460k. The Secretary of Interior was authorized to "administer such areas or parts thereof for public recreation when in his judgment public recreation can be an appropriate incidental or secondary use" and "to curtail public recreation use generally or certain types of public recreation use within individual areas or in portions thereof whenever he considers such action to be necessary...." *Id*.

**B. Elements**

The Government must prove the Defendant's guilt beyond a reasonable doubt. To prove the Defendant guilty, the Government must prove that on August 16, 2014,

(1) the United States held an unencumbered title to the shore of Little

ORDER - 7

Blalock Island;

(2) the shore of Little Blalock Island was part of the Umatilla National Wildlife Refuge System;

(3) the shore was closed to public access; and

(4) the Defendant was not authorized to be on the shore of Little Blalock Island.

**C. United States' Title and the UNWR boundary**

The Government must prove beyond a reasonable doubt that the Defendant was within the bounds of the UNWR.  The Government contends the UNWR boundary here is coterminous with its legal boundary for title purposes over Blalock Island.   In this case, the Government contends that Blalock Island's property boundary was <u>fixed</u> by the 1965 pre-John Day Dam condition of the Columbia River and its line of ordinary high-water.  In essence, the Government contends its condemnation title gave it an ownership interest in a section of navigable riverbed.   After it condemned the land, flooded it, and permanently expanded the footprint of the Columbia River by approximately 20 feet in elevation, the Government claims its boundary for purposes of title did not shift with the rising water under the principles of avulsion.

The Government's position regarding its ownership of the bed of an artificially created reservoir basin raises factual, legal and public policy

ORDER - 8

considerations transcending the consideration they have received in this prosecution. Some of these considerations include: 1) Does state or federal law determine navigable water boundaries involving federally condemned land?; 2) Who owns title to the land below the present-day high-water mark?; 3) Where is the "ordinary high-water mark" determined – at the historic natural level of the river or at the contemporary water lines artificially raised by the dam; and 4) Regardless of title, is the land below the contemporary high-water line subject to public use trust? The Court is mindful that this is not a suit to quiet title or for declaratory judgment. The only question is whether the Government has proven its case beyond reasonable doubt.

### 1.  Ownership of Lands over which Public Waters Flow

When Washington became a state, it acquired title to the beds of navigable waters between high-water marks and the lands beneath under the doctrine of equal footing. *Pollard v. Hagan*, 44 U.S. 212, 223 (1845). In the Washington State Constitution, adopted in 1889, the State formally declared its ownership over all submerged lands in navigable waters up to and including the line of ordinary high water. Const. art. 17, § 1. The Constitution did not, however, prohibit the State from subsequently disposing of such submerged lands; and the State did so with the majority of this valuable property until a shift in policy in 1971. *See Caminiti v. Boyle*, 107 Wash.2d 662, 672 n. 25 (Wash. 1987). There is no evidence before

ORDER - 9

the Court which suggests the State ever relinquished its sovereign interest in land up to the high-water mark surrounding Blalock Island.    *See also generally*, *Atkinson v. State Tax Comm'n of Oregon*, 303 U.S. 20 (1938)(as to territorial jurisdiction, State of Oregon never relinquished its sovereignty over the area occupied by the waters of the Bradford slough of the Columbia River and "United States did not acquire title to the bed of the river."). The Government's trial brief concedes that if the Defendant was not within the UNWR, then he "would have been on State land…" (ECF No. 15 at 8).

The Government claims it is the owner of the current shores of Little Blalock Island because the flooding caused by the dam was an avulsive process-- "a sudden and rapid change…that…is violent and visible…" *Harper v. Holston*, 205 P. 1062, 1064 (Wash. 1922).    In Washington, the common law avulsion principle is summarized as:

> When the course of the stream changes, the boundary line may or may not shift with the stream. If the change is slow and imperceptible so that it may be classified as accretion or reliction, the boundary line shifts. If, however, the change of the stream is avulsive, the original boundary line remains.

*Parker v. Farrell*, 445 P.2d 620, 622 (1968) (footnote omitted). However, the Government only presented evidence on the approximate fluctuation in water level, not the other hallmarks of an avulsion such as the suddenness and size of the change. Neither did Mr. Hills testify as to the grounds for his opinion an avulsion

ORDER - 10

occurred. Consequently, the Court cannot conclude on this record that the change falls squarely within a category of an avulsive change nor exclude the possibility that the applicable rule is: "where a navigable riverbed has shifted by 'a slow and continuous process,' the boundary…defined as the ordinary high water mark of the river in the original grant, shifted along with the actual ordinary high water mark of the river." *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251, 1261 (9th Cir. 1983).

In other boundary disputes involving islands in the Columbia River, the Army Corps of Engineers has taken the position that its jurisdictional boundary is the actual, not the historic, ordinary high-water mark. *See Jones v. Rose*, 2008 WL 552666 (D.Or. 2008)(unpublished)(jurisdiction for purposes of the Clean Water Act was actual ordinary high-water mark based upon the Clean Water Act's provision that "an area will remain navigable in law, even though no longer covered by water."). There is also authority from other jurisdictions indicating the ordinary high-water mark is to be determined based upon the current condition of the river, even if that condition has been affected by artificial changes like the creation of a dam. *See e.g., State v. Mills*, 592 N.W.3d 591 (N.D. 1999)(rejecting notion the ordinary high-water mark should be determined in the pre-dam state rather than the artificial conditions created after the dam); *State v. Superior Court*, 625 P.2d 256, 260-61(1981)("The monumental evidentiary problem which would

ORDER - 11

be created by measuring the boundary line between public and private ownership in accordance with the water level which existed prior to the construction of these dams provides a convincing justification for accepting the current level of [Lake Tahoe] as the appropriate standard."); *Board of Trustees v. Walker Ranch*, 496 So.2d 153, 155 (Fla.Dist.Ct.App. 1986)(finding it would be "illogical" to define the jurisdictional boundary between counties by ordinary high line water line before artificial control of water levels).

### 2. Public Trust Doctrine

Even if the Government could demonstrate it is the owner of the Blalock Island shores below the actual ordinary high-water mark, a question would remain whether Defendant had a public right of access pursuant to the public trust doctrine. The public trust doctrine protects public property interests for various uses of navigable waters and underlying lands. In 1892, the United States Supreme Court explained the status of the doctrine:

> It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States.

ORDER - 12

*Illinois Central Railroad v. Illinois*, 146 U.S. 387, 435 (1892). The public trust doctrine is a matter defined by state law. *United States v. 32.42 Acres of Land*, 683 F.3d 1030, 1038 (9th Cir.2012) (" '[T]he public trust doctrine remains a matter of state law,' the contours of which are determined by the states, not by the United States Constitution.").

In Washington, the public trust doctrine has been described as resembling "a covenant running with the land…for the benefit of the public," *Orion Corp v. State*, 109 Wash.2d 621 (Wash. 1987), and the public's "right to go where navigable waters go, even though the …waters lie over privately owned lands." *Wilbour v. Gallagher*, 77 Wash.2d 306, 315-16 (1969). " 'Certainly persons navigating the lake cannot be required or expected to carry with them a chart and compass and measuring lines to determine whether they are at all times within what were the limits of the lake prior to the construction of the dam.' " *Id.* (*quoting Mondota Club v. Anderson*, 101 Wisc. 479 (1899)). Although the doctrine by no means provides the public *unlimited* right of access below the ordinary high-water mark, the scope of the trust has been expanded to include the right "of navigation, together with its incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters." *Caminiti v. Boyle*, 107 Wash.2d 662 (1987).

ORDER - 13

The Court concludes reasonable doubt exists as to whether the Government's title is qualified by Washington's public trust obligations; or, instead, whether these rights only burden the private owner and were extinguished by the federal government's exercise of its power of eminent domain. *See e.g., U.S. v. 32.42 Acres of Land, More or Less, Located in San Diego County, Cal*., 683 F.3d 1030 (9th Cir. 2012)(declaring California state public trust rights extinguished under federal declaration of eminent domain); *Great Northern Ry. Co. v. Washington Elec. Co.*, 197 Wash. 627 (Wash. 1939)("…the state has…no more than the right to possess, use, and enjoy the bed of a navigable river as against all the world, except the government of the United States); *but see*, *U.S. v. 1.58 Acres of Land*, 523 F.Supp. 120 (D.C.Mass. 1981)(Government could condemn property below low water mark in full fee simple but was restricted in its ability to abdicate public trust in the land).

If the Government's title to Blalock Island is burdened by the public trust, it is questionable whether an expansive reading of the doctrine would include the Defendant's limited right to recreate in the shore zone as incidental to the right of navigation or swimming.  This appears to be an unresolved question in Washington as the Supreme Court explicitly reserved the question of "whether and under what circumstances the public has a right to enter upon or cross over private tidelands on foot" in *State v. Longshore*, 141 Wash.2d 414, 429 n. 9 (2000).  As access to vital

ORDER - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

recreational resources becomes more scarce, the public trust doctrine has been used to meet the changing needs of the public. Some states have declared the public's right to anchor small boats on the shore, to wade, and for limited pedestrian travel over unsubmerged private shorelands. *See Matthews v. Bay Head Improv. Ass'n*, 471 A.2d 355 (N.J. 1984)(holding "[t]he complete pleasure of swimming must be accompanied by intermittent periods of rest and relaxation beyond the water's edge. The unavailability of the physical situs for such rest and relaxation would seriously curtail and in many situations eliminate the right to . . . recreational use . . . ."); *Glass v. Goeckel*, 703 N.W.2d 58, 65 (Mich. 2005) (affirming public right to walk along the shore of Lake Huron below the ordinary high-water mark); *Mont. Coalition for Stream Access, Inc. v. Curran*, 682 P.2d 163, 170 (Mont. 1984)(recognizing the public's right to enter riparian private property to portage around obstructions in the river, but in the "least intrusive way possible, avoiding damage to the private property holder's rights."); *Madison v. Graham*, 126 F.Supp.2d 1320 (D. Mont. 2001)([T]he extent of the touching of the private streambed by a wader, for example, is de minimis and causes no more interference with private property right than does a floater.").

Since the date of the incident, Mr. Miltenberger, the *pro se* Defendant, has asserted a public right to recreate below the high-water mark. Yet the Government has not addressed the legal questions its position prompts, perhaps because

ORDER - 15

ordinarily property rights disputes are more suitable for resolution in civil proceedings, agency administrative action, or by the legislature, rather than petty offense prosecutions.

The Court finds the Government has not demonstrated beyond reasonable doubt that the UNWR boundary extends below the present day ordinary high-water mark or that its title is unencumbered by the public trust.

**D.     Unauthorized Access**

It easy to understand why many recreational users misunderstand the rights they possess vis-à-vis landowners along waterways. Although much of Washington riparian lands are privately owned, a survey once revealed that "most recreational users believe that riparian lands are publicly owned, thus giving a legal right to portage, anchor, walk, and fish on the beds and banks of the state's streams and rivers."  Stephen D. Osborne et al., *Laws Governing Recreational Access to Waters of the Columbia Basin: Survey and Analysis*, 33 ENVTL. L. 399, 448 n. 9 (2003).   On the shores of Little Blalock Island, the potential for mistaken assumptions by recreationalists and law enforcement alike is even greater due to the existence of a federal wildlife refuge on land acquired by condemnation; its location in a highly-used navigable river which is also an interstate boundary; its artificially controlled fluctuating shoreline; its historically permitted recreational

use; and the inadequate forms of public notice utilized by the FWS under these circumstances.

When the FWS subjects the recreational user to criminal liability for violating its regulations, the FWS has an obligation to utilize "appropriate methods" to give the public notice of the "permitted or curtailed public access, use or recreational activity." 50 C.F.R. §25.31. The UNWR public map and placement of small signs stating nothing more than "Island Closed" (especially near the current high-water mark) is insufficient to notify the recreational river user of 1) the UNWR boundary claimed by Government to include the entire shore and 2) curtailed public access to the space below the present day high-water mark. If this were the intent, the recreating public might expect to see notice on the map or signs in or near the water signaling "Do Not Enter Shore-Protected Wildlife Habitat"; "No Trespassing- Violators will be prosecuted'"; or "NOTICE: Keep Off Shore- Trespassing for any Purpose is Strictly Forbidden." The form of public notice used by the FWS does not correspond with its position taken in this prosecution and raises the potential for arbitrary enforcement of its regulations.

Based upon the above Findings of Fact and Conclusions of Law, the Court finds the Government has not met its burden of proof and the Defendant is not guilty of violating 50 C.F.R. §25.21, entering a closed area of a national wildlife refuge. The Court emphasizes the limited scope of this decision: it has only

ORDER - 17

determined that the Government has not proven its case against the Defendant beyond a reasonable doubt, the highest burden of proof known to the law; it has *not* determined whether the Defendant has a right to recreate on the shores of Little Blalock Island.

On the Court's finding that the Defendant is not guilty, the Clerk of this Court shall 1) enter this Order: 2) pursuant to Fed.R.Cr.P. 32(k), enter judgment in favor of the Defendant, dismissing the Violation Notice with prejudice; 3) provide copies of the Order and Judgment to counsel and the Defendant; and 4) close this file.

DATED this 16th Day of March, 2015.

<u>s/James P. Hutton</u>
JAMES P. HUTTON
UNITED STATES MAGISTRATE JUDGE

ORDER - 18